

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

FAROOQUE AHMED,  )
    Petitioner,  )
  )
  )
  )
  )  CASE No. 10-cr-00413-001
  )  USM No. 77315-083
v.  )
  )  Under Section 603(b) of the
  )  First Step Act, Which Amended
UNITED STATES OF AMERICA,  )  18 USC § 3582(c)(1)(A).
    Respondent.  )

MOTION REQUESTING THE HONORABLE DISTRICT COURT
ORDER EARLY RELEASE FROM PRISON GRANTING
COMPASSIONATE RELEASE.

COMES now, Farooque Ahmed, Petitioner, hereinafter ("Mr. Ahmed") or ("Petitioner"), a federal inmate serving a 276-month sentence imposed in 2011, after pleading guilty of having violated 18 USC § 2339B, for attempting to provide material support to a designated foreign terrorist organization (count I); and having violated 18 USC § 1922, for collecting information to assist in planning a terrorist attack on a transit facility (count II). Mr. Ahmed moves the Honorable District Court in order to request an early termination of his sentence after having been denied relief from the Federal Correctional Institution's Warden in January 13, 2023,(see attached exhibit '1'). Mr. Ahmed asserts this motion upon the authorities above captioned, and the following particulars.

1

INTRODUCTION

Mr. Farooque Ahmed, pro se, asks this Honorable District Court to grant him compassionate release by reducing Mr. Ahmed's term or imprisonment pursuant to 18 USC § 3582(c)(1)(A) due to extraordinary and compelling reasons warranting compassionate release. This Honorable Court is empowered to reduce a prisoner's sentence when there exists a drastic disparity in the defendant's sentence versus what he would have been sentenced today. E.g., United States v. McCoy, 981 F. 3d 271, 284 (4th Cir. 2020). Notably, Mr. Ahmed is now 47 years old, was arrested in October 27, 2010, and has served twelve and half years of his sentence or the equivalent of 63.2% of imprisonment.

Mr. Ahmed recidivism risk is considerably small. He has no prior criminal history, and although his crime was based on a well publicized sting operation,and was deemed a violent crime, there were no victims whatsoever. Mr. Ahmed, upon release, plans to reside with his elderly parents whom now require a greater degree of care and supervision in light of their age-related concerns. On the other hand, Mr. Ahmed has demonstrated substantial rehabilitation given his extensive and worth-while educational accomplishments in addition to his minimal infractions throughout his term of imprisonment. Upon release, Mr. Ahmed plans to continue in the pursuit of higher education and enroll in graduate school in hopes to complete a Master's Degree (of which he's only a few credits away from achieving it)and beyond  to reach a Doctorate in Computer Science and Engineering. An educational goal that would serve Mr. Ahmed well as he plans to own his own consulting business in the not so distant future.

On the other hand, Mr. Ahmed argues that he has been subjected to an increased  number of days in solitary confinement type of imprisonment, 3420

2

days, and counting so far. And such extraordinary and compelling circumstances warrant consideration as a factor among others he will expound upon, that would support a reduction of sentence. Mr. Ahmed asserts that his conditions of confinement at the Communications Management Unit ("CMU"), amount to solitary confinement as given long-term administrative and restrictive housing status, has deprived him of a liberty interest without the benefit of any meaningful due process. This type of confinement and its inherent restrictions, alters the amount and the kind of social visits with family and friends that he could have, and prohibits the direct contact with his visitors. As a result, Mr. Ahmed has been prevented from hugging his parents, or embracing his son throughout the years. In addition, Mr. Ahmed can only exercise in small indoor recreation rooms, and even the outdoors, unfortunately, are so heavily caged in for security purposes, that it makes its beneficial effect a constrictive one, effectively counter-acting the advantages to be had from the outdoor experience.

According to Mr. Ahmed, this prolonged isolationist and restrictive environment which he has been enduring for over 9-years, has caused him to suffer psychologically and emotionally tremendously. He has experienced among other things, apetite and sleep disturbances, anxiety, panic, paranoia, hallucinations, self-mutilations, hypersensitivity, cognitive dysfunction, hopelessness, suicidal ideation, and social withdrawal. And these conditions have been provoked by the unusual circumstances arising from Mr. Ahmed's lengthy imprisonment and their inherent detrimental effect on Mr. Ahmed's general health. These factors should be deemed extraordinary and compelling reasons warranting compassionate release.

Mr. Ahmed has been fully vaccinated against the COVID-19 virus (see this Petitioner's extensive medical records; he's requested them from the

3

institution's Health Services Dep't. At present, Mr. Ahmed still awaits for their provision). Yet, Mr. Ahmed affirms that he remains at an increased risk to contract any of the variants of the COVID-19 virus, due to his underlying medical conditions, the aggressive contagiousness of the fast-mutating variants, and the rapid transmission of the infection within crowded living environments such as a correctional facility. This Petitioner contends, on the other hand, that subjecting him to continued imprisonment in the current pandemic puts him at risk of serious illness or death; and the psychological stress of living through an outbreak knowing his very own vulnerability to the virus in an environment where infection control is nearly impossible will render his sentence greater than necessary. See United States v. Douglass, No. 10-171 (JDB), 2021 WL 214563, at *12 (D.D.C. Jan. 21, 2021).

Lastly, Mr. Ahmed suffers from several medical conditions developed throughout his imprisonment and which have been exacerbated because of the harsh and atypical conditions of his confinement. Since on or about 2010, when Mr. Ahmed was first incarcerated in the instant case, he developed an irregular heart beat that causes his breathing to slow down while producing a regular sharp pain in the chest when it occurs. Shortness of breath ensues affecting his overall mobility. This Petitioner also endures extreme allergies which affect his persistent Asthma notwithstanding the high dosages of antihistamines that he's prescribed. In addition, Mr. Ahmed has also been diagnosed with a Nasal Turbinate Hypertrophy due to an enlargement of the nasal conducts on either side of the nasal septum. A condition that causes the continuous drip of mucus at a regular basis. Mr. Ahmed has also been diagnosed of suffering  from Larynopharyngeal Reflux as a result from the seeping of fluids from Mr. Ahmed's lungs. (See attachment '2'). And these medical facts can be a deadly combination since the onset of the COVID-19 virus and

the several other varieties of respiratory illnesses now affecting the United States.

Unfortunately, for Mr. Ahmed, the buck doesn't stop there, as he also suffers from high blood pressure, a condition that has become much more elevated since the arrival of the coronavirus pandemic throughout the Terre Haute Institutional Complex. Mr. Ahmed was himself infected with the virus on February of 2022, along with the rest of the population in his housing unit at FCI Terre Haute, CMU unit. And although he recovered from the more serious symptoms of the viral infection, the residual effects continued over the ensuing months exarcerbating his already compromised personal health.

The realities and associated risks regarding the COVID-19 pandemic within a correctional facility, create a high risk environment for the spread of the coronavirus and its fast mutating variants. According to the Centers for Disease Control ("CDC") in this Winter season of 2022-2023, there is a "tripledemic" affecting the majority of the continental United States. And this medical fact includes a very particular respiratory illness termed "RSV", this year's seasonal flu, and the newest COVID-19 variant. These afflictions when considered alongside the multitude of particular conditions already affecting this Petitioner while in a correctional setting, constitutes an "extraordinary and compelling" reason for compassionate release and/or sentence modification. Even more so, these risks could be exponentially higher for an inmate such as this Petitioner who's had a long and documented medical history with a variety of potentially devastating and life-threatening health related conditions.

Mr. Ahmed, as if it wasn't yet enough, also suffers from a particular condition termed Temporomandibular Joint Disorder, a condition which forces him to live ina permanent state of pain with never ending and recurrent ongoing

5

headaches that do not respond well to any medical treatment. Incidentally, neck and back pain have followed causing sporadic bouts of dizziness and sleep apnea. Last, Mr. Ahmed has had surgery to repair a tear in the anterior cruciate ligament which included damage to the medial meniscus of the left knee. However, the surgeries did not manage to address his mobility issues, and now Mr. Ahmed has been left with the onset of arthritis permanently. The condition causes constant swelling and never ending pain affecting his general state of well being. Needless to say, the sum total of Mr. Ahmed's conditions as a whole, have rendered his daily living a constant struggle for survival.

Mr. Ahmed, it is worth noting, has struggled with mental health issues throughout his institutionalized life. Some of these issues have preceded his imprisonment such as his diagnoses of depression, and anxiety, yet because of his incarceration given diagnoses had been exacerbated. Including additional diagnoses for Post-Traumatic Stress Syndrome ("PTSD").

A sentence reduction would allow Mr. Ahmed to obtain treatment for his several conditions from medical specialists, continue with his ongoing mental health therapies, and have a greater participatory role on his life-decisions and general well being. Given Mr. Ahmed's long sentence (276-months), substantial rehabilitation while in prison, notwithstanding his personal struggles, his health concerns and age, extraordinary and compelling reasons warrant reducing Mr. Ahmed's sentence.

## FACTUAL BACKGROUND

Mr. Ahmed has been imprisoned since October 27, 2010, that is twelve

years, three months, and twenty one days. Mr. Ahmed had no prior criminal history before the instant case. He was sentenced to 276-months for terrorism related charges. His sentence included fifty years of supervised release. There were no victims in his case. See United States v. Farooque Ahmed, Case No. 10-cr-00413-001, (E.D.Va. 2010).(See attachment '3' ).

Throughout Mr. Ahmed's twelve and half years of imprisonment, he has been a compliant, disciplined, and responsible inmate. Mr. Ahmed has faced no significant disciplinary issues. His CMU unit team has considered him a low-security (custody) inmate, with a low-risk recidivism level. In contrast, many of the inmates at the Terre Haute Correctional Complex, and specifically within the restrictive housing unit (CMU) where Mr. Ahmed is being housed, are high and maximum-security inmates. Mr. Ahmed, is an intelligent, educated, technically savy individual who loves teaching and the pursuit of knowledge from every sound source he can. So much so that while in prison Mr. Ahmed has completed over one hundred (100) educational and vo-tech courses, and has taught many of those courses himself performing as an Adult Continuing Education ("ACE") instructor for the institution's Education Dep't. at FCI Terre Haute. Courses ranging from Investing, to the Bill of Rights, Algebra I,II, and III, and even on the French Revolution. (See attachment '4' ).  Mr.Ahmed is a Computer Science Specialist, having earned a B.S. in Computer Science from the College of Staten Island, in New York. In addition Mr. Ahmed is  but only a few credits away from receiving his Master's Degree in Computer Science. He is also a devout Muslim who is constantly sharing the bounty of his faith by deed and not just by word alone. And in that regard, he is studious, dedicated, methodical, and exhibits a generosity of spirit very seldom seen in the hopeless hallways of a Federal Correctional Institution.

7

Mr. Ahmed, however, has suffered from a long history of diffuse pain due to the several medical conditions he's afflicted from throughout his long incarceration. And such complaints are repeteadly mentioned all over his extensive medical file and records. The Doctors over the years have diagnosed a host of different maladies. Sleep disturbances as a related problem over Mr. Ahmed's Asthma and Rhinitis, all consistent with his repeated complaints of fatigue and shortness of breath. Depression, on the other hand, was also diagnosed as a problem related to his incarceration and his difficulty in coping with the reality of his confinement. Mr. Ahmed has also reported headaches, abdominal pain, and Asthma symptoms consistent with his regularly experienced wheezing and difficulty breathing when performing menial tasks. And, it should be added, that Mr. Ahmed has had a documented history--before and certainly during his imprisonment-- of persistent neurocognitive and affective disorders, and he took medication to control his anxiety. Nevertheless, his incarceration and the conditions of his confinement (and classification) have increased the intensity of the pre-existing illnesses, including the onset of several others such as his PTSD diagnoses.

<u>ARGUMENT.</u>

I.    MR. AHMED HAS THE STATUTORY RIGHT TO PETITION FOR A REDUCED SENTENCE UNDER THE FIRST STEP ACT OF 2018.

The First Step Act of 2018, 115 P.L., 391, 132 Stat. 5194 (2018), which amended 18 USC § 3582(c)(1)(A), grants the Court the authority to reduce a sentence when "extraordinary and compelling circumstances" are present, as they are here. As a result of the First Step Act, a court need not rely upon a motion

by the Director of the Federal Bureau of Prisons ("FBOP"). 18 USC § 3582(c)(1)-(A)(i); see Pub. L. No. 98-473, 98 Stat. 187S, 1998-99 (Oct 12, 1984). Instead, a court may now reduce a sentence "upon motion of the defendant" in two circumstances: (i) when the defendant has exhausted his administrative remedies to appeal the FBOP declining to bring a motion or (ii) when 30 days have elapsed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 USC § 3582(c)(1)(A); see, e.g., United States v. Muhammad, No. 20-7520, 2021 U.S. App. LEXIS 31582, at *6 (4th Cir. Oct. 20, 2021) ("The text of § 3582(c)(1)(A) plainly provides that a defendant may file a motion on his own behalf 30 days after the warden receives his request, regardless of whether the defendant exhausted his administrative remedies.").

On December 23, 2022, Mr. Ahmed sent a request for a sentence reduction on his own behalf to Warden T. Rule, at the Federal Correctional Institution (FCI) at Terre Haute, Indiana, where Mr. Ahmed is currently serving his sentence at the CMU unit (see attachment '1'). More than thirty days have elapsed since the warden's receipt of Mr. Ahmed's request and the FBOP has not filed a motion on his behalf. Further, the warden responded to Mr. Ahmed in a letter dated January 13, 2023, stating: "...you are not appropriate for RIS at this time." (See attachment '1'). Accordingly, Mr. Ahmed brings this motion directly under the amended 18 USC § 3582-(c)(1)(A).

Under § 3582(c)(1)(A), a court may reduce a petitioning prisoner's sentence if the "court...finds that...extraordinary and compelling reasons warrant such a reduction and that the reduction," is "consistent with applicable policy statements issued by the Sentencing Commission," and court considers the § 3553(a) sentencing factors. 18 USC § 3582(c)(1)(A). The Sentencing Commission has guided that "extraordinary and compelling" reasons warranting release may be based on the

following: (A) the prisoner's medical condition; (B) the prisoner's age; (C) family circumstances; or (D) "[o]ther [r]easons," defined as "extraordinary and compelling reasons other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13,cmt.n.1; e.g., United States v. Haynes, 456 F. Supp 3d 496, 508 (E.D.N.Y. 2020).

II.    COURTS REGULARLY GRANT COMPASSIONATE RELEASE WHEN DEFENDANTS WOULD BE SUBJECT TO A MUCH SHORTER SENTENCE IF SENTENCED TODAY.

"Any extraordinary and compelling reason" includes a large sentencing disparity between the prisoner and other defendants convicted of the same crime. See, e.g.,United States v. Redd, 444 F. Supp. 3d 717, 722 (E.D. Va. 2020)(granting defendant's motion to reduce his sentence brought "based on extraordinary and compelling circumstances with respect to his excessive term of imprisonment and his extensive rehabilitation while incarcerated."). In McCoy, the Fourth Circuit affirmed the district court's grant of a sentence reduction primarily due to the dramatic disparity in the defendant's sentence versus the sentence that would, on average, have been sentenced today, in light of changes in sentencing law. United States v. McCoy, 981 F. 3d 271, 285-88 (4th cir. 2020. Specifically, the court emphasized "the 'incredible length of the [32-year] mandatory sentence imposed,' which far exceeded the necessary factor to 'achieve the ends of justice.' If sentenced today...McCoy likely would be subjected to less than half that sentence --a disparity of over 200 months." Id. at 278 (citation omitted). The court also placed weight on that McCoy's young age at the time of the offense "with no relevant criminal history," making stacked sentencing particularly inappropriate. Lastly, the court considered "McCoy's rehabilitation, shown through his many educational and vocational achievements and his restitution payments."

10,

Further, the court emphasized that a sentence reduction must take into account "the substantial sentences the defendants already had served at the time of their motions..." McCoy, 981 F. 3d at 286 (citations omitted). In the essentials of its sentencing analysis McCoy is indistinguishable from Mr. Ahmed's case. Moreover, McCoy instructs that because the FBOP used its compassionate release power so sparingly Congress removed the FBOP from the equation for the very purpose of relaxing the administration of the standard and making compassionate release more available.

Consistent with McCoy, many courts have granted sentence reductions based primarily on gross disparities in prisoners' original sentences versus what they would be sentenced today, combined with rehabilitation while incarcerated. See Redd, 444 F. Supp. 3d at 728 (reduced from 50.25 years to 20.25 years); United States v. Wilkerson, No. 5:96-cr-167-1H, 2021 U.S. Dist. LEXIS 52048, at *5 (E.D.N.C., Mar. 19, 2021) (reduced from life imprisonment plus 45 years to time served); Babb v. United States, No. ELH-04-0190, 2021 U.S. Dist. LEXIS 105829, at *29 (D. Md. June 4, 2021) (reducing sentence from life imprisonment plus 5 years to 30 years); United States v. Haynes, 456 F. Supp. 3d 496 (E.D.N.Y., 2020)(reducing sentence from 46.5 years to time served); United States v. Hope, No. 90-cr-06108-KMW-2, 2020 U.S. Dist. LEXIS 86395, at *3 (S.D. Fla. April 10, 2020) (reducing sentence from life imprisonment to time served); United States v. Brown, 457 F. Supp. 3d 691, 699 (S. D. Iowa 2020) (reducing sentence from 42.5 years to time served); United States v. Robles, 2021 U.S. Dist. LEXIS 150046, at *33 (S.D.N.Y. Aug. 10, 2021) (deciding to reduce 35-year sentence once defendant exhausted administrative remedies); United States v. McDonell, 513 F. Supp. 3d 752, 757 (E.D.Mich. 2021)(reducing sentence from 107 years and 1 month to 20 years); United States v. Adeyemi, 470 F. Supp. 3d 489, 520 (E.D.Pa.

2020) (reducing sentence from 32 years and 1 month to time served); United States v. Hammoud, U.S. Dist. LEXIS 214184, No. 3:00-cr-00147-GCM-DSC(W.D.NC. Charlotte Division, Nov. 29, 2022) (Mr. Hammoud's sentence was similar to this Petitioner's including his rehabilitative efforts, and conditions of confinement. The district court agreed to reduce Hammoud's sentence from 30 years to time served, after having served 20 years of his term.).

A.   Courts May Reduce Sentences for Disparities in Sentencing Even When There is No Change in Sentencing Law.

Although McCoy involved an eliminated mandatory sentencing stacking under 18 USC § 924(c), its broad principle of considering the length of a defendant's sentence versus what the defendant would be sentenced today and its recognition of Congress's intent to reduce prison time when theres a low risk of recidivism must guide courts in their consideration of motions to reduce a sentence. See, McCoy, 981 F. 3d at 284 (holding that "district courts are 'empowered ... to consider any extraordinary  and compelling reason for release that a defendant might raise.'"); see also United States v. Gonzales, 520 U.S. 1, 5, (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"). Further, courts applying McCoy have held that gross sentencing disparities specifically warrant sentence reductions. See, e.g., Babb v. United States, No. ELH-04-0190, 2021 U.S. Dist. LEXIS 105829, at *29 (D. Md. June 4, 2021) (holding " a gross sentencing disparity may constitute an extraordinary and compelling reason to grant compassionate release"). As such, Fourth Circuit district courts have followed McCoy's reasoning to other types of disparities in sentencing beyond a change in the statute that was the basis of the sentence affecting the prisoner. See United States v. Payton, No. PJM 06-341, 2021 U.S. Dist. LEXIS 46804, at *4 (D. Md. Mar. 10, 2021) (expanding McCoy's holding to instances of

disparities between the defendant and a co-defendant's sentence).

Courts have also reduced sentences due after considering the length of a sentence and amount of time served, along with other factors--regardless of change in sentencing law. For example, in United States v. Adeyemi, the court considered how pursuant to the First Step Act of 2018, Adeyemi's sentence today would be lower after the change in § 924(c)'s sentence stacking, and noted the substantial case law granting compassionate release in light of gross disparities in sentencing post-amendment of the Act. 470 F. Supp. 3d 489, 520 (E.D.Pa. 2020). After finding that a change in § 924(c)'s stacking alone did not warrant an extraordinary and compelling reason on its own, Id. at 524-25, the court considered the FBOP's "other" enumerated factors for identifying extraordinary and compelling reasons, specifically:

> The nature and circumstances of the defendant's offense, his criminal history, comments from victims, unresolved detainers, supervised release violations, institutional adjustment, disciplinary infractions, personal history derived from the presentence investigation report, length of sentence and amount of time served, current age and age at the time of the offense and sentencing, release plans, and whether release would minimize the severity of the offense.

470 F. Supp. 3d at 525 (citation omitted). The court then "consider[ed] each of these factors and conclude[d] [defendant] fulfills each and every one. Relying on the Federal Bureau of Prisons' own criteria for 'other' extraordinary and compelling circumstances warranting compassionate release, we grant [defendant's] compassionate release motion." Id.

Notably, despite a change in sentencing law under the First Step Act making Mr. Adeyemi's sentence longer than it would be had he been sentenced today, the court held nonetheless that "[w]e ultimately conclude Mr. Adeyemi has shown extraordinary and compelling reasons--not due to Mr. Adeyemi's health conditions

alone, nor due to a change in sentencing law, but under the combination of the factors approved and applied by the Federal Bureau of Prisons." Id. at 529. In analyzing the length of sentence and the amount of time served, the district court considered Adeyemi's extraordinary long sentence and the much shorter sentence he would receive if sentenced today. Id. at 528. Thus, Adeyemi exemplifies a court's ability to grant a sentence reduction due to disparities in sentencing regardless of whether the disparity is specifically due to intervening change in sentencing law.

B.    Courts Considerr Mean and Median Sentences of Defendants with Similar Records.

Finally, courts may consider sentencing disparities among defendants with similar records, by comparing sentences of other persons convicted under the same offense. Specifically, in United States v. Eccleston, the court compared the defendant's 417-month sentence to the mean and median sentences of persons convicted of similar crimes, as demonstrated through the most recent United States Sentencing Commission ("U.S.S.C.") Report No. CR 95-0014 JB, 2021 U.S. Dist. LEXIS 108877, at *143 (D.N.M. June 10, 2021); see also Babb, 2021 U.S. Dist. LEXIS 105829, at *32 (D.Md. June 4, 2021)(comparing the defendant's sentence and noting it was "significantly longer" than other federal sentences according to the USSC report average and granting his reduction of sentence); Haynes, 456 F. Supp. 3d at 500 (comparing Haynes' sentence to the averages sentences of defendants with the same crimes through statistics compiled by the USSC and granting his reduction in sentence). In Eccleston, the defendant had been convicted of two firearm counts to be served consecutively and robbery counts to be served concurrently. Eccleston, 2021 U.S. Dist. LEXIS !)**&&, at *143.

14

After determining the mean and median sentence length for robbery and firearm offenses based on the report, the court added these amounts together as a proxy for Eccleston's sentences being served consecutively. The court then concluded that added together, the mean and median sentence for defendants who committed similar crimes today would be 209 and 170 months, respectively, which was substantially shorter than Eccleston's 417-month sentence. This finding weighed in favor of the court's decision to modify his sentence from 417 months to 228-months. Id. at *149.

III.    "EXTRAORDINARY AND COMPELLING REASONS" WARRANT A REDUCTION IN MR. FAROOQUE AHMED'S SENTENCE.

A.    Mr. Ahmed's 276-Month Sentence is Excessive in Comparison to Other Defendants Sentenced to Lesser Terms For Similar Crimes.

Mr. Ahmed, has been imprisoned for well over twelve and half years despite being convicted exclusively for nonviolent crimes where noone was ever harmed. And while the counts of conviction in Mr. Ahmed's case are very serious, providing material support to a foreign terrorist organization, the court none-theless ought to recognize the support provided by Mr. Ahmed was of a low-monetary impact. A fact that pales in comparison to other terrorism related financing cases in which defendant's have been granted compassionate release. For example, a defendant convicted of providing material support and sentenced to five years in prison for facilitating tens of millions of dollars to Hezbollah, a Lebanon-based terrorist group, was granted compassionate release after serving less than one year of his sentence. U.S. v. Tajideen, 1:17-cr-046 (D.D.C. May 28, 2020). **

(**. Mr. Ahmed, irrespective of the charges stated on the indictment document and its description of the events, never did he ever transfer any financial funds to any terrorist organization or any individual anywhere for terrorist purposes, with the exception of purchasing a $20.00 dollar Metro-card).

1.    Terrorist Defendants With Much More Egregious Conduct have Been Granted Compassionate Release.

The fact that Mr. Ahmed is convicted of a material support and for collecting information to assist in planning a terrorist attack on a transit facility, should not bar him from compassionate release. In fact, courts have granted many motions for compassionate release on grounds such as medical concerns to defendants convicted of terrorism related charges, including involvement in violent attacks on the United States, refusing to disqualify them based upon the offense of conviction. See, United States v. Bary, No. 98-cr-1023 (LAK).at *7 (S.D.N.Y. Oct. 7, 2020)(granting compassionate releaseto prisoner on medical grounds despite his being involved in the bombing of two United States embassies, resulting in the deaths of hundreds of people); United States v. Hassoun, 470 F. 3d 804 (N.D. Ill. 2020) (granting compassionate release due to COVID to defendant convicted of attempted use of a weapon of mass destruction and malicious attempt to destroy or damage a building using an explosive device and sentenced to a 23-year sentence); United States v. Rana, No. 09 CR 8308, 2020 U.S. Dist. LEXIS 208638, at *2 (N.D. Ill. June 9, 2020) (granting compassionate release on medical grounds to defendant convicted of providing material support for a planned attack against a private newspaper that never transpired).

Many defendants with convictions for providing material support to a Designated Foreign Terrorist Organization ("DFTO") and conspiracy to do the same, a similarly related charges like Mr. Ahmed's, have also been granted compassionate release. United States v. El-Hanafi, 460 F. Supp. 3d 502, 505 (S.D.N.Y. 2020) (granting compassionate release to defendant convicted of providing material support to a DTFO (Al Qaeda) and conspiring to the same); United States v. Hawo Mohammed Hassan, No. 10-187 (02) (MJD), 2020 U.S. Dist. LEXIS 165638, at *1 (D.

Minn. Sept 10, 2020) (granting compassionate release to defendant who was convicted of conspiracy to provide material support to a DFTO). The fact that Mr. Ahmed was convicted under a material support to a DFTO should therefore not prevent this court from granting him early release.

Further, in granting compassionate release where the underlying conviction is material support, the court can consider whether the amount of money and other resources provided to terrorism contrasts in comparison to other terrorism financing cases that were granted compassionate release. United States v. Amina Farah Ali, No. 10-187 (01)(MJD), 2021 U.S. Dist. LEXIS 73320, at *6 (D.Minn. Apr. 16, 2021) (granting compassionate release at time served to defendant who provided approximately $15,000 and shipments of clothing and was sentenced to 240 months imprisonment). Comparing these cases to Mr. Ahmed's, it is clearly obvious how less culpable Mr. Ahmed's conduct had been. And although this Petitioner has affirmatively and decidedly assumed responsibility for his past criminal conduct, and fully understands the potential and numerous ramifications that could have occurred had any of it would have taken place, it is important to note that Mr. Ahmed was led to participate in many of the particulars by an overeager FBI informant. Mr. Ahmed, on the other hand, had been a law-abiding citizen, husband, professional, devout Muslim man, who had never entertained jihaddist ideology of any kind. And it took a great degree of effort and subterfuge by given informant to entangle Mr. Ahmed in what constitutes the biggest mistake of his life. Again, Mr. Ahmed possesses a lesser degree of culpability than many defendants that have been granted compassionate release.

B.    Under 3553(a) Factors Mr. Ahmed is Qualified for Release Based
      Upon Time Served and Specifically, Mr. Ahmed Has Been Subjected
      to Atypical Conditions of Confinement, and He is Not a Danger
      to the Community, Consistent with U.S.S.G. § 1B1.13.

This brief does not attempt to focus at any length on all the factors set forth in 18 USC § 3553(a), which are largely duplicative of discussion throughout this brief. These factors include the nature of the offense and the defendant's characteristics (non-violent, first offense); (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment (having served twelve and a half years of it, or 63.2%); (3) the kinds of sentences available and the applicable Guideline range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; (6) the need to provide restitution to victims (no victims were ever affected by this Petitioner's conduct)(restitution was paid in full). 18 USC § 3553(a). For example, the first, second, and third factors overlap with Mr. Ahmed's arguments, based on the non-violent nature of his conduct, being his first offense, sentence disparity with other similarly charged and convicted individuals, and length of sentence. The sixth factor is inapplicable, as there were no victims. Analyzing these factors in ligth of Mr. Ahmed's acceptable record while incarcerated and his health issues, including the unusual conditions of his confinement, further supports this petition.

1.    Mr. Ahmed's Atypical Conditions of His Confinement.

Mr Ahmed is an American citizen of Pakistani descent, who after a well publicized sting operation within the jurisdiction of the Eastern District of Virginia, was charged and subsequently pled guilty to providing material support

18

to a DFTO (the underlying conviction) and collecting information to assist in planning a terrorist attack on a transit facility. Once convicted Mr. Ahmed was classified by the Federal Bureau of Prisons as a low-security prisoner (see Male Custody Classification Form, attachment *5' ), but following his sentencing, he was designated to the Communications Management Unit ("CMU") at the Terre Haute Correctional Complex, and located within the Federal Correctional Institution, FCI Terre Haute. A prison within a prison, within yet, another prison. Mr. Ahmed has been a resident of the CMU for nine and a half years total. Mr. Ahmed, although a devout and sincere Muslim, is opposed to violent and extremist religious ideologies.(Mr. Ahmed, it should be noted, has had no communications related incident reports in 12½-years of imprisonment).

## CMU Conditions of confinement.

Most federal prisoners live in general population prison units, where they interact with a large population of fellow prisoners, receive 300-plus minutes of social telephone (up to 520-minutes based upon First Step Act of 2018) per month, and can enjoy contact visits with family and friends limited only by visiting hours and visiting room space--for up to 49 hours per month. The FBOP encourages these individuals to use social telephone calls, visits, and letters to keep in touch with family and loved ones, due to the critical role such social and familial contact plays in personal development, psychological and emotional wellbeing, and last but not least, in ensuring a successful reentry back into society. Because general population units impose no unusual restrictions, people may be transferred from one to another at the FBOP's discretion, and without notice or a hearing. See Meachum v. Fano, 427 U.S. 215 (1976).

In contrast, the CMUs were designated for prisoners who "require communications monitoring beyond that which can feasibly be provided in the general population."(See Aref v. Barr, COA 1631155 at *3, D.C. Cir. 2016).

19

See also, 28 C.F.R. § 540.200 et seq. While this broad description renders thousands of prisoners eligible for CMU placement, very few have been so designated (see Jayyousi v. Garland, No.20-5368,appellant's brief at *6, U.S. Ct.of Appeals D.D.C. Cir. Apr. 7, 2021). CMU inmates live, program, and work separately from all other prisoners. And although the FBOP does not use the term "isolation", to refer to the CMU classification, the reality of it is that it qualifies as a form of "restrictive housing" since the inmates confined there are housed outside of the normal general population. As an example of given restrictions, and for the purpose of this petition, Mr. Ahmed has not had the benefit of an "outside" recreation yard where he could have had the opportunity to walk, jog, or sit on a rec-yard bench and simply enjoy the psychological and emotional advantages of the outdoors experience,like every other inmate in general population would have. Most negatively for Mr. Ahmed, all avenues of communication with the outside world are restricted and monitored. All of his social visits had to be live-monitored by the FBOP's Counter Terrorism Unit ("CTU"). There were no contact visits. And all of his visits, of which he'd only had very few of them occurred prior to his placement in the CMU unit. What's more, these visits are strictly non-contact--meaning that prisoners and their visitors, including young children, meet in partitioned rooms separated by thick plexiglass, speak over a phone, and are forbidden from hugging or touching hands.(See attachment_'6'_).

Telephone restrictions are similarly harsh. CMU social calls can be limited to three 15-minute calls per month, with immediate family only(see 28 C.F.R. § 540-.204(a)). The FBOP voluntarily provides two pre-scheduled 15-minute calls a week. Like visits, all social calls are live-monitored. Written correspondence is read by CTU officials to determine whether it should be forwarded to the recipient. There is no current limit on correspondence, but the regulation authorizes limiting

mail to six double-sided pages per week, to one recipient only. 28 C.F.R § 540.-203.

In addition, CMU inmates although allowed to program, they are only offered very limited opportunities to do so, certainly not to the degree and availability afforded to those inmates housed in general population. Notwithstanding the many restrictions imposed, Mr. Ahmed has always strived to seek sources of knowledge and personal development even at his own expense, in the absence of institutional support for such efforts. As an example, Mr. Ahmed has volunteered to facilitate his own education and that of countless other inmates, by aquiring the educational materials for a particular course of study on his own, studying it, mastering its particulars, preparing lesson packets and other class material, to then teach, tutor, and facilitate given classes to anyone who would want to take advantage of them. And this explains how Mr. Ahmed has been able to accumulate over a hundred-plus educational and vo-tech programs throughout the years.(See attachment '4' ).

CMU placement is indefinite; there is no limitation on the duration of a prisoner's designation, and most placements last for years.

Criteria for CMU placement have developed over time, and have changed to fit, post hoc, the type of prisoners who were being sent to the CMU. Thus when Mr. Ahmed was initially designated to the CMU, he could not compare the reasons for his placements against any criteria. Today, there are five criteria for CMU placement:

> (a) The inmate's current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism;
> (b) The inmate's current offense(s) of conviction, offense conduct or activity...indicates a substantial likelihood that the inmate will encourage, coordinate, facilitate...illegal activity through communication with persons in the community;
> (c) The inmate has attempted, or indicates a substantial likelihood that the inmate will contact victims...;

> (d) The inmate committed prohibited activity related to misuse
> or abuse of approved communication methods while incarcerated;
> or
> (e) There is any other substantiated/credible evidence of a
> potential threat to the safe, secure, and orderly operation of
> prison facilities...as a result of the inmate's communication
> with persons in the community.

28 C.F.R. § 540.201. Not all prisoners who fit the criteria are considered, recommended or approved for CMU placement, and the FBOP has never developed guidance as to how the criteria should be applied. These vague criteria have allowed for a disturbing over-representation of Muslim men, like Mr. Ahmed, in the CMU. As for Mr. Ahmed's own classification and subsequent designation to the CMU, his transfer notice indicate for starters:

> "You have been identified as a globally inspired islamic extremist.
> You continue to spouse hatred towards the United States, non-
> Muslims and others who are not aligned with your violent,extremist
> beliefs... (See attachment '7' ).

And although the transfer notice text continues on rehashing a series of unverified and unsubstantiated allegations used to support CMU placement, Mr. Ahmed was never "a globally inspired islamic terrorist," and never did he attempt to recruit, or rally others to participate in any disruptive conduct while housed within FBOP custody. What's more, Mr. Ahmed categorically denies ever participating or attempting to participate in using inmate communications as afforded by the institution, to convey threats of any kind to civillians and members of the U.S. Military. Further, had he done so as alleged by the spurious allegations used against Mr. Ahmed by FBOP staff elsewhere, he would have been easily referred for prosecution leading to a potential indictment and conviction at the most, and certainly disciplinary sanctions at the institutional level at the least. Yet, none of it ever occurred, for there were no genuine, factual, and let alone legal basis to advance such frivoulous allegations. Mr. Ahmed received no hearing prior to his placement to

the CMU; instead he was told--after his arrival there--that he could challenge his designation to it by utilizing the FBOP's Administrative Remedy Program ("ARP"), but not a single CMU prisoner has ever been released from the CMU as a result of that process--noone in 17 years. (the CMUs were set up in 2006).

Mr. Ahmed has requested that his unit team transfer him out of the CMU to a facility closer to his family. Mr. Ahmed's parents are elderly, and suffer from a variety of illnesses and conditions that could potentially affect their mortality. Mr. Ahmed's father, Mr. Shafiq Ahmad, has had a history of prostate and testicular issues from which he's already had a surgery. However, the issues have returned and the long-term prognosis for a gentleman who's 81 years old, and also is afflicted by diabetes, and high blood pressure, is certainly not an encouraging one.  Mr. Ahmed's  mother, on the other hand, is a 71 year old woman also suffering from several debilitating conditions and physical impairments who's constantly requiring intensive chronic care and living assistance on a daily basis. Mrs. Samina Raana, has had to endure two consecutive bouts with the COVID-19 virus throughout the height of the pandemic 2020-2021. A fact that complicated her already preexisting high blood pressure, arthritis diagnoses, intestinal complications, and general body-inflamation and retention of fluids.   Granting compassionate release, will certainly alleviate the dire conditions being felt and experienced by Mr. Ahmed's elderly parents because of their severe medical conditions. Mr. Ahmed is fully prepared to become their caregiver.(See attach.'8'). *1

Mr. Ahmed's confinement and CMU classification has severely interfered with his ability to maintain a meaningful relationship with his family. And this fact had a direct link to his wife divorcing him in 2014. The lack of contact, as described above, caused Mr. Ahmed's wife considerable stress and emotional harm, unfortunately more than what she was prepared to handle, leading her to file for

*1. Mr.Ahmed, the elder, suffers from hypothyroidism, hypertension, diabetes, atherosclerotic heart disease, herniated discs, acid reflux,    23    and had cardiac bypass surgery, among others.

irreconcilable divorce.

In addition to finding extraordinary and compelling circumstances, the Court must find that the reduction conforms with "applicable policy statements issued by the Sentencing Commission," and the Court must consider "the factors set forth in § 3553(a)." 18 USC § 3582(c)(1)(A). In considering Sentencing Commission Policy Statements, courts look to United States Sentencing Guideline § 1B1.13, which largely reiterates other requirements from § 3582(c)(1), and adds that the defendant is not a danger to the safety of any other person or to the community. 18 U.S.C.G. § 1B1.13; McCoy, 981 F. 3d at 276. In conducting this analysis, courts typically consider risk of recidivism and disciplinary incidents as shown through FBOP reports, casework done while in prison. See e.g., Haynes, 456 F. Supp. qt 517; Babb, 2021 U.S. Dist. LEXIS 105829, at *47-49.

Mr. Ahmed is not a danger to the community, and his risk of recidivism is extraordinarily low. Notwithstanding his medical and mental health issues, he's had a very positive impact on his fellow inmates, both as a diligent and patient instructor in many educational areas, and as an individual on account of his firm and sincerely held islamic beliefs. As an example, in a letter of support written by a fellow inmate, he wrote that Mr. Ahmed:(see attachmet '12').

> "...has gained my respect and admiration due to his knowledge and skill at problem solving and defusing all sorts of potentially serious conflicts among the inmate community..."

Other than a couple of minor incidents throughout his disciplinary history, Mr. Ahmed has faced no material violations of institutional rules. See, Adeyemi, 470 F. Supp. 3d at 525 (finding the defendant's four disciplinary infractions, including "possession of a cell phone" did not negatively weigh against the defendant when the court granted motion to reduce his sentence from 385 months (32 years) to time served, or 165 months. Quite the opposite, Mr. Ahmed has used

24

his time productively to the best of his ability to further his own education as evidenced by his extensive and wide array of educational courses completed over the years and acquired against the backdrop of very harsh circumstances affecting his psychological and emotional health while at the CMU.(See attachment '9'). Additionally, on October 7, 2022, Mr. Ahmed's Case Manager at the time, Ms. Rebekka Eisele, completed his First Step Act Needs Reassessment form, and listed Mr. Ahmed of having a "low" risk of recidivism. On November 16, 2022, Mr. Ahmed's now newly appointed Case Manager, at the CMU, found him to be a "low" custody inmate on his Male Custody Classification Form. See Attachment "5' ).

The fact that Mr. Ahmed hopes to become his elderly parents caregiver now that they so desperately need him to be, together with his demonstrated good behavior over the years, his educational pursuits and attainments, the harsh and unusual conditions of his confinement at a CMU, his strong desire to become reacquainted with his teenage son--soon to be fourteen yeras of age--and who's been forced to grow up not knowing his father, ought to be taken into account by the District Court in granting sentence reduction to time served. See, United States v. Hassoun, 470 F. Supp. 3d at 806 (acknowledging Hassoun had engaged in a "malicious attempt to destroy or damage a building using an explosive device", but concluding he "has demonstrated that he has taken positive steps while serving his time in custody these past almost 10 years...." And receiving sentence reduction to time served.).

In contrast, many of the prisoners in Terre Haute are high and maximun-custody prisoners. Mr. Ahmed's educational attainments, professional training, and low-risk of recidivism, as designated by the FBOP, further support Mr. Ahmed's request for compassionate release. See, United States v. Amina Farah Ali, No.10-187(01)(MJD), 2021 U.S. Dist. LEXIS 73320 (D. Minn. Apr.16, 2021)(granting

25

compassionate release on COVID grounds to a material support defendant and reasoning that "Defendant does not pose a danger to the community if released" because "[t]he BOP assigned Defendant a Minimum Risk Recidivism Level" and [w]hile serving her sentence, Defendant has completed a number of educational programs and has obtained her GED.").

Mr. Ahmed's educational training and other attainments while serving his term, will prepare him for gainful employment and a successful transition back out to society. His plans of completing his Master's Degree in Computer *2. systems, which is only but a few credits away from completion, and his hope to continue furthering his education by achieving a Doctorate in Computer Science will certainly guarantee his future success on the other side of the wall.

As the court in McCoy considered the prisoners "rehabilitation, shown through his many educational and vocational achievements" in reducing McCoy's sentence, likewise the Honorable District Court ought to consider Mr. Ahmed's unrelentless efforts at his rehabilitation and other educational achievements, including his low-risk of recidivating.

C.   Mr. Farooque Ahmed Suffers From Ongoing Medical Conditions That Have
     Not Been Resolved in Prison, Including Material COVID-19 Risk.

Another factor the court considers, in analyzing applicable § 3553(a) factors, includes whether the sentencing imposed "provide[s] the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 USC § 3553(a)(2)(D); see Rana, 2020 U.S. Dist. LEXIS 208638, at *11 (noting this § 3553(a) factor further warranted a sentence reduction to provide medical care to the defendant).

(*2. Mr. Ahmed will be completing a Master's Degree in Computer Engineering or Systems Engineering).

Since 2010, when Mr. Ahmed was first incarcerated in the current case of conviction, he's developed an irregular heart beat that not only slows down his breathing but it comes accompanied by regular sharp pain in his chest area and shortness of breath. Mr. Ahmed also suffers from extreme allergies which exacerbate his persistent-asthma condition despite being prescribed increased dosages of antihistamines. Mr. Ahmed has requested appointments with an specialist to assess the severety of these particular ailments, but to no avail. It appears that budgetary constraints by the FBOP limit the level and quality of care that's available to him while imprisoned. On the other hand, Mr. Ahmed has also been diagnosed with a nasal turbinate hypertrophy due to an enlargement of the nasal conducts on either side of the nasal septum. A condition that causes the continuous drip of mucus-like fluids at a regular basis. Larynopharyngeal reflux has ensued due to the seeping of fluids from Mr. Ahmed's lungs. And these ailments can work in a deadly combination with other severe viral infections such as COVID-19, and other respiratory illnesses that have wrecked havoc in the United States in recent times. (See attachment '2' ).

Unfortunately for Mr. Ahmed, the list of ailments affecting him continues, since he also suffers from high blood pressure. A condition that has become much more elevated since the spread of the COVID-19 pandemic throughout the Terre Haute Correctional Complex. Mr. Ahmed was himself affected with the coronavirus on February of 2022, along with the rest of the population in his housing unit. Furthermore, Mr. Ahmed also suffers from temporomandibular joint disorder, a condition that forces him to live in a permanent state of pain with never ending migraine headaches which interfere with his daily activities. He stays fatigued regularly, and often times is forced to rest during the day. This particular condition does not respond to any medical treatment of any kind. Consequently, neck and back pain have followed incidentally, along with sporadic, but recurrent

bouts of dizziness and sleep apnea. At a lesser level, but ceratainly not the least, Mr. Ahmed has had surgery to repair a tear in the anterior cruciate ligament and damage to the medial meniscus of the left knee. Yet, the surgery did not manage to fully address his mobility issues. Incidentally, he has been left with the onset of [permanent] arthritis, and given condition causes constant swelling of the knees and never ending daily discomfort that will never go away according to Dr. Trueblood, one of the institution's medical authorities. These conditions, as a whole, have rendered Mr. Ahmed's daily living a constant struggle for survival.  Therefore, and in light of this Petitioner's medical history and not quite effective treatment as offered by the FBOP, granting compassionate release will allow Mr. Ahmed the opportunity to seek and obtain the adequate medical care he needs to address his numerous conditions.

Lastly, Mr. Ahmed's conditions of confinement have played a significant role in explaining the deterioration of Mr. Ahmed's state of mind. Since, as it is, he finds himself currently at CMU's segregated housing unit ("SHU") attempting to seek a hardship transfer elsewhere (closer to his parents and family) by refusing to continue programming under CMU classification and placement. However, Mr. Ahmed has been seeking such transfer for quite a few years now, and through different means of engagement, as evidenced by the numerous requests to be granted such transfer (see attachment '9' ); the FBOP has denied or ignored his requests to a prison environment that would afford him much more enviromental, social, and occupational stimulation.

Mr. Ahmed's life history and personal characteristics support a favorable sentencing consideration. In United States v. Pressley, 345 F. 3d  1205, 1218-19 (11th Cir. 2005), the defendant presented substantial, detailed, and compelling evidence about the inhumane, cruel, and physically, emotionally

and mentally painful conditions in which he had already been detained for a period of almost four years. For example, he presented evidence...of being kept in extreme isolation...where he was subjected to...prolongued physical and mental pain, extreme enviromental stresses, noise and temperature variations, and deprivation of sensory stimuli and sleep...At sentencing, the trial judge accepted the facts of his confinement...which also included evidence about the impact on one's mental health of prolonged isolation, and solitary confinement. The decision in Pressley allows for a sentence reduction to account for the particular conditions of defendant's confinement. Mr. Ahmed, likewise, begs the Court to consider the particular and restrictive conditions of his confinement at the CMU, and grant the relief he seeks, that is compassionate release.

What's more, prolonged restrictive confinement such as the kind that Mr. Ahmed is being forced to undertake at present, is one of the true horrors of the penal system. "Years on end of near-total isolation exact a terrible price." (See Davis v. Ayala, 576 U.S. 257, 135 S.Ct. 2187, 2210, 192 L. Ed. 2d 323 (2015) (Kennedy J. concurring). Studies have shown that prolonged solitary confinement can result in paranoia, hallucinations, suicidal ideation, feelings of impending doom, decline inmental functioning, insomnia, nightmares, and many other symptoms related to severe depression and anxiety. (See Porter v. Clarke, 923 F. 3d 348, 355-57 (4th Cir. 2019)). Mr. Ahmed, unfortunately, falls squarely as being affected by some of these mental health conditions. Depression and anxiety.(See attach. '10'). Other effects include post-traumatic stress disorder ("PTSD"), self-mutilation, obsessional thinking, dangerous weight loss, and the aggravation of pre-existing health issues. See Williams v. Sec'y Pa. Dep't of Con.,848 F. 3d 549,566 (3rd-Cir. 2017). There is not a single study of restrictive confinement wherein non-voluntary confinement that lasted longer than 10 days failed to result in negative

psychological effects." Dr. Stuart Grassian, MD., a Psychiatrist and Research Scientist and faculty member at Harvard Medical School, has noted in multiple cases similar to Mr. Ahmed's position in this Petition, how inmates that are placed in solitary confinement are at great risk of psychological decompensation, leading to self-harm and suicidal ideation. While at SHU, Mr. Ahmed has attempted self-mutilation as a result of his inability to dealing with the conditions of his confinement at the CMU, and his fast deteriorating mental health. (The event occurred this past December of 2022, where Mr. Ahmed had swallowed a number of razor blades in a desperate effort to call attention to what he perceives to be his hopeless designation and classification as a CMU inmate) (see, attachment '10' ).

According to Dr. Grassian, solitary confinement "imposes a devastating triad of emotional and neuropsychiatric deprivations: social isolation, a barren perceptual environment, and deprivation of meaningful mental activity." he adds, "...that even in the first days of solitary confinement, suicide is much more common than in the general population and people often develop severe panic attacks, marked by intense fear, dread of impending death, and with somatic manifestations that include tachycardia, shortness of breath, and tremulousness." And, he specifically testified that "...the imposition of 72 hours in segregation can cause Psychological damage..." (See, Menocal v. Geo Grp., Inc. 2022 U.S. Dist. LEXIS 209858, No. 14-cv-02887-JLK-MEH (D.Colo. Oct. 18, 2022)). Mr. Ahmed, has been at a CMU designation for over nine years, and counting. A fact that can be easily considered a modified yet restrictive housing arrangement.

In a case from the Southern District of New York (see United States v. Rodriguez, No. 00-cr-761-2 (JSR), 492 F. Supp. 3d 306, 2020 U.S. Dist. LEXIS 181004, 2020 (S.D.N.Y. Sept. 30, 2020), in the court's judgment, a day spent in prison under extreme lockdowns and in well founded fear of contracting a once-

30

in-a- century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. And while is clearly understood that such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably experienced as more punishing,(see U.S. v. Rodriguez, Id., noting that, "the pandemic, aside from posing a threat to [a defendant's] health, has made [ a defendant's] incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal.").

At the Terre Haute Correctional Complex where Mr. Ahmed has been housed, and where the CMU is located, visitations from the outside were prohibited, and educational programs stalled. And although Mr. Ahmed does not have the pertinent documentary evidence to illustrate to the District Court the kind of institutional steps taken by the Terre Haute Correctional Complex as a whole, the FBOP's policy has generally been to sharply limit time outside an inmate's unit for any purpose, even using phones or accessing the inmate computers, or even entering the library. Accordingly, the harsh prison conditions Mr. Ahmed has suffered during the pandemic should be relevant to the determination of whether extraordinary and compelling circumstances exist. (See United States v. Bryant, 2022 U.S. Dist. LEXIS 68148, 4th Cir. April 12, 2022)(citing U.S. v. McCrae, 2nd Circuit, noting the harsh and unprecedented restrictive prison conditions imposed as an infection deterrent during the pandemic, in granting compassionate release).

D.    Family Circumstances.

The Sentencing Commission Policy Statement suggests that the "incapacita-tion of [a] spouse or registered partner when [a defendant] would be the only

available caregiver for [that person]" could constitute an extraordinary and compelling reason in itself. U.S.S.G. § 1B1.13 cmt 1(C)(ii). Many courts, however, have credited family circumstances that do not quite meet this standard toward finding extraordinary and compelling reasons. For example, a court in the District of Connecticut found that even though a defendant "would not be the only available caregiver" for his mother, who was suffering from a terminal lung disease, he "could assist his mother in a way that no other person currently can...as a live-in caregiver." United v. Cruz, No. 94-cr-112 (JCH), 2021 U.S. Dist. LEXIS 68857, 2021 (D.Conn. April 9, 2021).

Similarly, a court in the Northern District of Illinois found that even though "there may be other family members who could care for" a defendant's wife, who was suffering from a serious liver disease that had impaired her immune system, the defendant "would reasonably be expected to be [his wife's] primary caregiver" as her spouse. See, United States v. Hansen, No. 17-cr-50062 (MFK), 2020 U.S. Dist. LEXIS 80494 (N.D.Ill. May 7, 2020); see also, Ledezma-Rodriguez, 472 F. Supp. 3d 498, 507 (S.D.Iowa 2020)(considering "the need to care for a parent" as "supportive of release" even though the defendant did not "produce enough evidence that he is the only available child who can aid [] his mother").

Mr. Ahmed has shown that his parents, Mr. Shafique and Mrs. Samina Raana Ahmed both suffer from a variety of ailments and impairments that require for them constant care to tackle everyday tasks. (See attachment '8'). Mr. Ahmed's sister and brother had somewhat shouldered the burden of caring for their parents's financial security, but not as their full-time caretakers since balancing a life and family of their own, including their own careers and work related obligations, has become an enormous strain in their ability to do so. These family predicaments are just as poignant and compelling as those present in Cruz, and Hansen.

32

There is no doubt that the totality of circumstances present in Mr. Ahmed's case constitute extraordinary and compelling reasons justifying his release.

## CONCLUSION

Mr. Ahmed, an American citizen born in Lahore, Pakistan, from a solidly middle-class family, was raised free from abuse but taught many worthy values by parents who instilled in him duty to family, devotion to God, and love and gratitude to the country filling them all with so many possibilities through the upholding of the law, under all circumstances. By all accounts, Mr. Ahmed had a normal childhood: he engaged in sports, Cricket being of his favorites, but kite-flying being where Mr. Ahmed had developed his passion for all things aeronautical. Mr. Ahmed graduated from Susan Wagner High School in New York in 1994, and practiced the Muslim faith of his parents and even attended religious classes. Mr. Ahmed has two other siblings. A sister, married with kids of her own and who works as an administrator at a medical firm, and a brother, also married with children, and who works as Assistant Director of Accounting at a firm in New York as well.( More precisely, at a New York Hospital).

Mr. Ahmed's attitude to being in the United States was one of committing himself to academic success. First, at College in Staten Island where he pursued a degree in physical therapy, and later at the College of Aeronautics, in Queens, New York, where he earned the respect of his teachers for his academic ability and potential, and graduated with a two-year degree. An effort that yielded even greater results after he transferred back to Staten Island College to complete a degree in Computer Science, where he graduated from in 2003. Years later, and after he had moved to Virginia to work for the United States Patent Office, he

33

married and had a son shortly before his arrest in 2010.

Prior to the commission of the instant offense, Mr. Ahmed worked as a contractor for a telecommunications company, and had no criminal history whatsoever. Yet, his life took a turn for the worst unexpectedly after he succumbed to the misrepresentations made in relation to the Islamic faith, and which did not comport with his vision of his own religious identity as a Muslim man in America, that were advanced by an overeager FBI source. And until those unfortunate moments when Mr. Ahmed made overt acts in furtherance of the charges he pleaded guilty to, he'd never entertained a right-wing view of his religious obligations. His family life, his devotion to a chosen religious path under Islamic guidance, and his duty to the country that had embraced him and his whole family, were paramount to his personal ethos. However, he erred mistakenly assuming his actions underscored the good he sought. A lapse in judgment and action Mr. Ahmed will forever regret , but that he hopes he will make amends for in the not-so-distant future. (See attachment '11').

Mr. Ahmed meets the requirement for "extraordinary and compelling reasons" warranting compassionate release pursuant to under 18 USC § 3582(c)(1)-(A). Mr. Ahmed's 276-month sentence is substantially longer than comparable sentences of prisoners sentenced for similar crimes, even including violent offenders. Upon release, Mr. Ahmed would be living with his parents in the State of New York, be gainfully employed, have access to appropriate medical treatment for his ailments and mental health concerns. Mr. Ahmed respectfully asks the Honorable District Court to grant him what remains of his life by reducing his sentence to time served.

On this 22 day of February of 2023.                    Respectfully submitted,

34

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRIGINIA
_____ DIVISION

_FAROOQUE AHMED_____
                    Plaintiff(s),

        v.

_United States of America_____
                    Defendant(s).

Civil Action Number: 1:10-cr-00413f-001

FILED
MAILROOM

APR - 7 2023

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## LOCAL RULE 83.1(M) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared, or assisted in the preparation of_____18 USC § 3582(C)(1)(A)__.
                                                              **(Title of Document)**

_FAROOQUE AHMED_____
Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: __3-24-23_____ (Date)

OR

The following attorney(s) prepared or assisted me in preparation of _____.
                                                              **(Title of Document)**

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document

_____
(Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _____ (Date)